AO 106 (Rev. 04/10) Application for a Search Warrant

AUSA Litton

# UNITED STATES DISTRICT COURT
### for the
Southern District of Ohio

In the Matter of the Search of

*(Briefly describe the property to be searched or identify the person by name and address)*

FOUR (4) CELLULAR PHONES LISTED IN ATTACHMENT A THAT ARE CURRENTLY BEING HELD AT THE MARIETTA POLICE DEPARTMENT

)
)
)
)
)
)
)

Case No. 2:20-mj-777

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A to Search Warrant Affidavit, incorporated here by reference.

located in the _____ Southern _____ District of _____ Ohio _____, there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B to Search Warrant Affidavit, incorporated here by reference.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☐ contraband, fruits of crime, or other items illegally possessed;

☐ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 2113(a) | -Bank robbery |
| 18 U.S.C. § 924(c) | -Use/carrying of a firearm during and in relation to a crime of violence |
| 18 U.S.C. § 922(g)(1) | -Felon in possession of a firearm |

The application is based on these facts:

See Search Warrant Affidavit, incorporated here by reference.

☐ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Jeremy N. Lindauer, FBI Special Agent
*Printed name and title*

Sworn to before me and signed in my presence.

Date: 11-16-20

_____
*Judge's signature*

City and state: Columbus, Ohio

United States Magistrate Judge
*Printed name and title*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF FOUR (4) CELLULAR PHONES LISTED IN ATTACHMENT A THAT ARE CURRENTLY BEING HELD AT THE MARIETTA POLICE DEPARTMENT, LOCATED AT 301 WEST PUTNAM STREET, MARIETTA, OHIO 45750 | CASE NO. _____ |

## AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR A SEARCH WARRANT UNDER FEDERAL RULE OF CRIMINAL PROCEDURE 41

I, Jeremy N. Lindauer, Special Agent with the Federal Bureau of Investigation, being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1.      I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant authorizing the examination of property—more specifically, four (4) cellular telephones, as described in more detail in Attachment A—which are currently in law enforcement possession, and the extraction from that property of electronically stored information as described in Attachment B.

2.      I am a Special Agent with the Federal Bureau of Investigation ("FBI"), assigned to the Resident Agency in Athens, Ohio. I have been so employed since 2015. Prior to joining the FBI, I worked as a patrol officer for the Fishers Police Department in Fishers, Indiana, between 2008 and 2015. While there, I received training and experience in conducting many types of criminal investigations, including theft and robbery. I was promoted to Field Training Officer for the department prior to leaving to accept a position as Special Agent for the FBI in 2015.

3.      Within the FBI, I was first assigned to the Joint Terrorism Task Force in New York City, where I conducted and assisted in complex terrorism investigations across the globe. I was transferred to the Athens Resident Agency in September of 2020, where my responsibilities once again include investigating crimes such as theft and robbery.

4.      As a Special Agent, I am a "federal law enforcement officer" within the meaning of Rule 41(a)(2)(C), that is, I am a government agent engaged in enforcing the criminal laws and am duly authorized by the Attorney General to request such a warrant.  As part of my duties as a Special Agent, I investigate criminal violations relating to bank robbery, in violation of Title 18, United States Code, Section 2113(a), and firearm offenses, in violation of Title 18, United States Code, Sections 922 and 924.

5.      This affidavit is intended to show only that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

## IDENTIFICATION OF THE DEVICES TO BE EXAMINED

6.      The property to be searched ("SUBJECT DEVICES") is listed in Attachment A and is described in more detail as follows:

a.  One (1) black Samsung cellular phone with a black cover.
   i.    Model:  SM-S205DL
   ii.   IMEI:   357626103404738

b.  One (1) black Samsung cellular phone with a black cover and cracked screen.
   i.    Model:  SM-S205DL
   ii.   IMEI:   357626103381324

c.  One (1) black Samsung cellular phone with a cracked screen.
   i.    Model:  SMJ327A
   ii.   Serial #: R28J93F68QY

d.  One (1) black LG cellular phone.
   i.    Model: LG108C
   ii.   Serial #: 610CQUK0158678

2

## PROBABLE CAUSE

7.      On Thursday, October 22, 2020, at 2:32 p.m., officers from the Marietta Police Department responded to a panic alarm at the Citizens Bank Co., located 110 Second Street, Marietta, Ohio (Washington County), within the Southern District of Ohio.  The responding officers made contact with the Bank Manager, Robin Schilling, who informed them that the bank had just been robbed of an undetermined amount of money.  The deposits of the Citizens Bank Co. are insured by the Federal Deposit Insurance Corporation.

8.      During the initial investigation, Detective A.J. Linscott of the Marietta Police Department spoke with bank employees who were present at the time of the robbery.  The bank employees reported that the suspect walked into the bank wearing: (1) a bright red hoodie sweatshirt with an Ohio State logo on the front; (2) a mask covering his face that resembled an elderly male; and (3) and eye glasses.

9.      The bank employees reported that the suspect was approximately 5'9" tall, and that he appeared to be of thin build, because the sweatshirt he was wearing appeared oversized on him. The suspect was carrying a black bag and carried what appeared to be a handgun underneath his right arm.  One of the bank employees told Detective Linscott that the bag the suspect was carrying had the work "Berkley" printed on it.

10.     The bank employees stated that the suspect forced his way through the partition between the lobby and the area where the bank clerks are stationed, which is off limits to the public. The suspect then walked over to the register drawers and took U.S. Currency in paper form from the drawers.  After the suspect had taken the money, he walked out of the bank.  Prior to leaving, the suspect made a statement to the effect of "thanks for doing business."

3

11.     Bank employees advised that the suspect had taken "bait money," or cash that the bank maintains for the purpose of detecting thefts and for which the bank logs and maintains the serial numbers for individual bills.

12.     Detective Linscott reviewed the CCTV footage from the bank at the time of the robbery.  During the initial investigation, Marietta Police Officers identified William E. Johnson (a/k/a "Billy 'White Shoes' Johnson"), DOB: February 4, 1965, as a primary suspect.  Detective Linscott identified Johnson as a suspect because officers were aware, from speaking with other investigators in West Virginia, that Johnson had been indicted for the October 2017 robbery of the nearby Williamstown National Bank.  During that robbery, the suspect also wore a mask which made him appear to be an elderly male and threatened bank employees with something which appeared to be a gun.  The height of the robber in that case was also consistent with the description provided for Johnson.

13.     Detective Linscott reviewed records from the Marietta Police Department and the Washington County (Ohio) Prosecutor's Office and learned that Johnson had been indicted for robbing several banks in Washington County in 2002, including the same Citizens Bank Co. branch in Marietta that was robbed on October 22, 2020.  As a result of a plea agreement in that prior case, Johnson pled guilty to two counts of Aggravated Robbery, with firearm specifications, and theft.  He was later sentenced to fifteen years imprisonment in the Ohio Department of Rehabilitation and Corrections.  Arrests for those robberies were included in the computerized criminal history ("CCH") for William E. Johnson that Detective Linscott ran on October 22, 2020.

14.     William E. Johnson's CCH contained the following arrests (among others):

    a.   Aggravated Burglary, arrested on May 24, 1983, by  the Columbus, Ohio Division of Police;

b. Aggravated Burglary (two counts), arrested on April 4, 1985, by the Washington County (Ohio) Sheriff's Office;

c. Aggravated Robbery (three counts), arrested on February 26, 2002, by the Washington County (Ohio) Sheriff's Office;

d. Robbery, arrested on February 7, 2003, by the Washington County (Ohio) Sheriff's Office;

e. Aggravated Robbery, arrested on May 17, 2010, by the Washington County (Ohio) Sheriff's Office; and

f. Felonious Assault, arrested on December 14, 2018, by the Fairfield County (Ohio) Sheriff's Office;

15. Johnson's CCH also indicated that an active warrant was out for his arrest with a nationwide extradition notice for a parole violation lodged by the Ohio Adult Parole Authority.

16. On Thursday, October 22, 2020, Detective Linscott spoke with the Williamstown, West Virginia Chief of Police, Shawn Graham, by phone. Chief Graham reported that on or about September 22, 2020 (just one month prior), Williamstown Police Detective John Casto observed William E. Johnson at a Motel 6, located at 6333 Emerson Avenue, Parkersburg, West Virginia. Detective Casto recognized Johnson based on his earlier investigation of the 2017 Williamstown National Bank robbery. Detective Casto checked Johnson for active warrants, however, there were none in the system at that time. Investigators later learned that there had been a delay in entering the Wood County (West Virginia) warrant into the NCIC system. In fact, Wood County did not enter its warrant for William E. Johnson until October 22, 2020. Detective Casto also identified the vehicle that he observed Johnson in during his September 22, 2020 surveillance. That vehicle was listed as a Jeep bearing Ohio Registration #JBP5471.

5

17.     Representatives of the West Virginia Fusion Center spoke with Sergeant Rhett Walters of the Marietta Police Department and advised him that the License Plate Reader on the I-77 Bridge (southbound) showed that a Jeep bearing Ohio Registration #JBP5471 crossed the bridge from Marietta, Ohio, to Williamstown, West Virginia, at approximately 3:06 p.m. on October 22, 2020.  In other words, a vehicle that Johnson was observed in just one month prior to the Citizens Bank Co. robbery was seen traveling between Marietta and Williamsport roughly 34 minutes after Marietta Police responded to the bank robbery that is the subject of this investigation. The I-77 Bridge is less than two miles from the location of that robbery.

18.     Detective Linscott also learned from Marietta Police Chief R.A. Hupp, who had been in contact with Williamstown Police Chief Shawn Graham, that William E. Johnson had checked into the same Motel 6, located at 6333 Emerson Avenue, Parkersburg, West Virginia, on October 22, 2020.

19.     On October 22, 2020, at 6:33 p.m., Marietta Police Dispatcher Kevin Bums sent a teletype to Southeast Ohio and Wood County (West Virginia) law enforcement to be on the lookout for William E. Jonson and/or a Jeep bearing Ohio Registration #JBP5471, as Johnson was the chief suspect of the Citizens Bank Co. robbery.

20.     On October 22, 2020, at 7:44 p.m., Detective Linscott contacted the Motel 6 on Emerson Avenue by phone and spoke with a desk clerk.  The clerk reported that on this date, at 6:43 p.m., William Johnson had checked into the motel.  The motel room was rented for $51.51 and was paid for by means of three (3) twenty dollar bills.  Johnson provided an Ohio Department of Corrections Card as proof of identification when he checked into the motel.

21.     Shortly after 10:00 p.m., Detective D.A. Young and Detective Linscott responded to the CVS located at 4418 Emerson Avenue, Parkersburg, West Virginia, after learning that William E. Johnson was arrested at that location by Parkersburg Narcotics Task Force officers.

      a. Detective Linscott spoke with Detective Cody McClung of the Wood County (West Virginia) Sheriff's Office. Detective McClung advised that he and Trooper Seth Cook of the West Virginia State Police were watching for the Jeep known to be operated by William E. Johnson when they saw the vehicle park in the CVS parking lot. When Detective McClung and Trooper Cook approached the Jeep, Johnson fled on foot and was apprehended shortly after when Trooper Cook used a Taser to subdue him. Johnson was transported to the Camden Clark Medical Center Emergency Room for treatment and medical clearance.

      b. Detective McClung advised that during a search of Johnson incident to his arrest, officers found and removed several thousand dollars from his person. Detective McClung then had the Jeep towed from the CVS parking lot to a secure garage.

      c. Upon examining the currency seized from Johnson in connection with his arrest, Detective Linscott determined, based on a serial number comparison, that $960.00 in twenty dollar bills was the same "Bait" money stolen from the Citizens Bank Co. earlier that day.

      d. During a search incident to Johnson's arrest, West Virginia State Trooper Seth Cook located and seized a cell phone belonging to Johnson, which is listed as "Item a" of the SUBJECT DEVICES.

7

22.     On Friday, October 23, 2020, at approximately 9:30 a.m., Detective Linscott met with Detective McClung at the garage where the Jeep had been towed. Detective Linscott was present while Detective McClung executed a search warrant he obtained for the Jeep through the Wood County (West Virginia) Magistrates' Court. Wood County officials were searching for a weapon and ammunition. During a search of the Jeep, officers found several pieces of evidence that indicated Johnson was the suspect they were searching for from the Citizens Bank Co. robbery the day before, including the following:

     a.  Officers found a black bag with a "Berkley" logo on it on the front passenger floorboard. Inside that bag, officers found a loaded pistol, a knife, and black zip ties. Wood County officials turned over the pistol to Marietta Police as evidence.

     b.  Detective Linscott observed a pair of brownish shoes with dark laces in the back of the passenger compartment that resembled the suspect's shoes, according to the bank's CCTV footage that he previously reviewed. Detective Linscott also saw a pair of eye glasses that resembled the glasses the suspect wore, a pair of blue/gray pants in the backseat that resembled the ones worn by the suspect, along with a United States Atlas with certain cities circled in Kansas, including Salina, Russell, WaKeeney, and Grainfield.

23.     On October 23, 2020, Detective Linscott and other Marietta Police officers executed a different search warrant on the Jeep issued by the Washington County (Ohio) Court of Common Pleas. During execution of that warrant, officers located three (3) more cellular phones, including "Items b, c, and d" of the SUBJECT DEVICES.

8

24.     I am aware that most people use and carry a cellular phone.  By now, the systemic and pervasive use of cellular phones by society cannot be denied.  Indeed, Chief Justice Roberts, writing for a unanimous Supreme Court, observed that cellular phones "are now such a pervasive part of daily life that the proverbial visitor from Mars might conclude they were an important feature of human anatomy."  *Riley v. California*, 573 U.S. 373, 385 (2014).  I am also aware that criminals, including bank robbers, frequently communicate with others before, during, and after they have engaged in criminal activity.  Additionally, I know that many people use cellular phones as a GPS device to obtain driving directions and to determine fastest routes when traveling.  I am aware that many people use cellular phone applications and online services such as Google Maps to determine when businesses are open, or even whey they are usually busiest throughout the day.  This type of information would be useful to a bank robber who wished to ensure the bank was open and had the fewest possible witnesses at the time of the robbery.

25.     Based upon my training and experience, I know robbers often take pictures of their proceeds and/or firearms on their cellular phones.  I also know that robbers often communicate with others about their robberies using their cellular phones and check press coverage about their crimes.  Moreover, if an accomplice was used for the robbery, communication likely would have occurred with the accomplice via telephone call, text message, or other means of communication on the cellular phone prior to, during, and/or after the crime.  Finally, pictures and other communication on a cell phone could incriminate the robber by, for example, including a picture of the person wearing the same clothing as was worn by the robber or a message during which the person communicates with someone about obtaining the same clothing as was worn by the robber or a firearm used by the robber.  I also know that criminals oftentimes take pictures and place phone calls regarding their crimes, even after the crime has taken place.  The SUBJECT DEVICES appear

9

to have photographing and text messaging capabilities. Therefore, probable cause exists to justify the search of the cellular phones described herein.

26.     The SUBJECT DEVICES are currently in the possession of the Marietta Police Department. They came into the Marietta Police Department's possession in the manner described above, pursuant to William E. Johnson's arrest and subsequent searches of his Jeep. Therefore, while the Marietta Police Department might already have all necessary authority to examine the SUBJECT DEVICES, I seek this additional warrant out of an abundance of caution to be certain that an examination of the SUBJECT DEVICES will comply with the Fourth Amendment and other applicable laws.

27.     The SUBJECT DEVICES are currently in storage at the Marietta Police Department's evidence locker at 301 West Putnam Street, Marietta, Ohio 45750. I know that the SUBJECT DEVICES have been stored in a manner in which their contents are, to the extent material to this investigation, in substantially the same state as they were when the SUBJECT DEVICES first came into possession of the Marietta Police Department.

## TECHNICAL TERMS

28.     Based on my training and experience, I use the following technical terms to convey the following meanings:

a.  Cellular telephone: A cellular telephone (or wireless phone or mobile phone) is a handheld wireless device used for voice and data communication through radio signals. These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones. A cellular telephone usually contains a "call log," which records the telephone number, date, and time of calls made to

10

and from the phone. In addition to enabling voice communications, cellular telephones offer a broad range of capabilities. These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet. Cellular telephones may also include global positioning system ("GPS") technology for determining the location of the device.

b. Digital camera: A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film. Digital cameras use a variety of fixed and removable storage media to store their recorded images. Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader. Removable storage media include various types of flash memory cards or miniature hard drives. Most digital cameras also include a screen for viewing the stored images. This storage media can contain any digital data, including data unrelated to photographs or videos.

c. Portable media player: A portable media player (or "MP3 Player" or iPod) is a handheld digital storage device designed primarily to store and play audio, video, or photographic files. However, a portable media player can also store other digital data. Some portable media players can use removable storage media. Removable storage media include various types of flash memory cards

11

or miniature hard drives. This removable storage media can also store any digital data. Depending on the model, a portable media player may have the ability to store very large amounts of electronic data and may offer additional features such as a calendar, contact list, clock, or games.

d. GPS: A GPS navigation device uses the Global Positioning System to display its current location. It often contains records the locations where it has been. Some GPS navigation devices can give a user driving or walking directions to another location. These devices can contain records of the addresses or locations involved in such navigation. The Global Positioning System (generally abbreviated "GPS") consists of 24 NAVSTAR satellites orbiting the Earth. Each satellite contains an extremely accurate clock. Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers. These signals are sent by radio, using specifications that are publicly available. A GPS antenna on Earth can receive those signals. When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

e. PDA: A personal digital assistant, or PDA, is a handheld electronic device used for storing data (such as names, addresses, appointments or notes) and utilizing computer programs. Some PDAs also function as wireless communication devices and are used to access the Internet and send and receive e-mail. PDAs usually include a memory card or other removable storage media for storing

12

data and a keyboard and/or touch screen for entering data. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can store any digital data. Most PDAs run computer software, giving them many of the same capabilities as personal computers. For example, PDA users can work with word-processing documents, spreadsheets, and presentations. PDAs may also include global positioning system ("GPS") technology for determining the location of the device.

f. IP Address: An Internet Protocol address (or simply "IP address") is a unique numeric address used by computers on the Internet. Every computer attached to the Internet computer must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination. Most Internet service providers control a range of IP addresses. Some computers have static—that is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

g. Internet: The Internet is a global network of computers and other e-devices that communicate with each other. Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

29. Based on my training, experience, and research, I know that the SUBJECT DEVICES have capabilities that allow them to serve as cellular telephones, digital cameras, portable media players, GPS navigation devices, and PDAs. In my training and experience,

13

examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device.

## ELECTRONIC STORAGE AND FORENSIC ANALYSIS

30.    Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time. Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device. This information can sometimes be recovered with forensics tools.

31.    *Forensic evidence.* As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of· the crimes described on the warrant, but also forensic evidence that establishes how the SUBJECT DEVICES were used, the purpose of their use, who used them, and when. There is probable cause to believe that this forensic electronic evidence might be on the SUBJECT DEVICES because:

    a.  Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).

    b.  Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

    c.  A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how the device was used, the purpose of its use, who used it, and when.

14

d. The process of identifying the electronically stored information on a storage medium that is necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data on a device is evidence may depend on other information stored on the device and knowledge about how a device behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e. Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

32. *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the SUBJECT DEVICES consistent with the warrant. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the device to human inspection in order to determine whether it is evidence described by the warrant.

33. *Manner of execution.* Because this warrant seeks only permission to examine devices already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premises. Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

15

## CONCLUSION

34.     I submit that this affidavit supports probable cause for a search warrant authorizing

the examination of the SUBJECT DEVICES described in Attachment A to seek the items

described in Attachment B as evidence of the crimes of bank robbery, in violation of Title 18,

United States Code, Section 2113(a); use or carrying of a firearm during and in relation to a crime

of violence, in violation of Title 18, United States Code, Section 924(c); and being a felon in

possession of a firearm, in violation of Title 18, United States Code, Sections 922(g)(1) and

924(a)(2).

Jeremy N. Lindauer
Special Agent
Federal Bureau of Investigation

Sworn to and subscribed before me this ___ day of November, 2020.

_____
United States Magistrate Judge
United States District Court, Southern District of Ohio

## ATTACHMENT A

The property to be searched ("SUBJECT DEVICES") is described in detail below and is all currently located in the evidence locker of the Marietta Police Department, located at 301 West Putnam Street, Marietta, Ohio 45750:

    a.  One (1) black Samsung cellular phone with a black cover, found on the person of William E. Johnson incident to his arrest on October 22, 2020.
        i.  Model:  SM-S205DL
       ii.  IMEI:   357626103404738

    b.  One (1) black Samsung cellular phone with a black cover and cracked screen, found in a silver Jeep bearing Ohio Registration #JBP5471 and recovered during execution of a Washington County (Ohio) Search Warrant conducted on October 23, 2020.
        i.  Model:  SM-S205DL
       ii.  IMEI:   357626103381324

    c.  One (1) black Samsung cellular phone with a cracked screen, found in the trunk area of a silver Jeep bearing Ohio Registration #JBP5471 and recovered during execution of a Washington County (Ohio) Search Warrant conducted on October 23, 2020.
        i.  Model:  SMJ327A
       ii.  Serial #: R28J93F68QY

    d.  One (1) black LG cellular phone, found in the front console of a silver Jeep bearing Ohio Registration #JBP5471 and recovered during execution of a Washington County (Ohio) Search Warrant conducted on October 23, 2020.
        i.  Model: LG108C
       ii.  Serial #: 610CQUK0158678

This warrant authorizes the forensic examination of the SUBJECT DEVICES for the purpose of identifying the electronically stored information described in Attachment B.

17

## ATTACHMENT B

1.      All records on the SUBJECT DEVICES described in Attachment A that relate to violations of Title 18, United States Code, Section 2113(a) [bank robbery]; Title 18, United States Code, Section 924(c) [use or carrying a firearm during and in relation to a crime of violence]; and Title 18, United States Code, Sections 922(g)(1) and 924(a)(2) [felon in possession of a firearm] involving William E. Johnson between the dates October 1, 2017, and the present, including:

      a.  Lists of contacts and related identifying information;

      b.  Photographs;

      c.  Internet history;

      d.  GPS data;

      e.  Text messages or messages stored in other messaging platforms;

      f.  Data stored on the SUBJECT DEVICES through social media platforms to include Facebook, Instagram, Snapchat, and other unnamed platforms similar in nature;

      g.  Voicemails;

      h.  Stored electronic messages;

      i.  Any information related to sources of firearms (including names, addresses, phone numbers, or any other identifying information);

      j.  Any information recording the schedule or travel from October 1, 2017, to the present related to the user(s) of the SUBJECT DEVICES;

      k.  All bank records, checks, credit card bills, account information, and other records;

18

l.  Evidence of user attribution showing who used or owned the SUBJECT DEVICES at the time the things described in this warrant were created, edited, or deleted such as logs, phonebooks, saved usernames and passwords, documents, and browsing history; and

m.  Records evidencing the use of the Internet Protocol address to communicate with unnamed servers, including:

   i.  records of Internet Protocol addresses used; and

   ii.  records of Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

2.  As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of electronic storage (such as flash memory or other media that can store data) and any photographic form.

3.  This warrant authorizes a review of electronic storage media and electronically stored information seized or copied pursuant to this warrant in order to locate evidence, fruits, and instrumentalities described in this warrant.  The review of this electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts.  Pursuant to this warrant, the FBI may deliver a complete copy of the seized or copied electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

19